TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,

v.

J. Roy GOODEAUX, Appellee.

No. 7332.

Court of Civil Appeals of Texas, Beaumont.

March 30, 1972.

Motion for Rehearing Overruled April 20, 1972.

Mehaffy, Weber, Keith & Gonsoulin, Beaumont, for appellant.

W. E. Dryden, Beaumont, for appellee.

DIES, Chief Justice.

This is a workmen's compensation case. The parties will be referred to here as they were below.

Plaintiff alleged an eye injury to have occurred on September 7, 1967, when spray from a cooling tower containing acid and chemicals entered his right eye. Trial was to a jury which found that he sustained an accidental injury in the course of his employment which was a producing cause of total loss of sight in the eye which began October 9, 1967, and would exist permanently. Judgment was accordingly entered for plaintiff from which defendant has perfected this appeal.

While defendant urges twelve points of error, essentially they all consist of its contention that the evidence is insufficient to connect plaintiff's alleged injury with the loss of sight in his right eye. This, then, will necessitate a somewhat long and full discussion of the facts.

Plaintiff, a sixty-two-year-old pipe fitter, testified that on September 7, 1967, he got spray from a water cooler in his eyes. Subsequent testimony shows that the water contained sulphuric acid and hagatreet. Before that time, he had no visual trouble. At the time of the infusion, he was wearing protective glasses to prevent the intrusion of chemicals but some way the spray got under the lenses and in his eye. This caused a burning situation so he went across the street to use an eye wash provided by his employer. He then complained to his "pusher," was sent to first aid, and then the next morning to a Dr. Caskey who several days later sent him to Dr. Jerry Johnson, a Beaumont ophthalmologist. This latter doctor saw plaintiff on a Monday after the Thursday accident. Some eye drops were administered and twenty-eight days later he went back to work since some improvement was noted. On the third day thereafter the right eye began troubling him again. He again went to Dr. Johnson's office and at that time could only distinguish between light and dark.

Dr. Johnson testified that he first saw plaintiff for this condition on September 11, 1967, at which time plaintiff gave a history of having gotten "chemical . . . into his eyes, particularly his right eye" which the doctor diagnosed as "post-traumatic pariconjunctivitis," which he described as "irritation after a trauma or after an injury." At the time of the first visit, plaintiff's visual acuity in the right eye was 20/150. He again examined him on September 15th "and the visual acuity again was quite reduced in the eye" but he could not "pinpoint" the cause of the reduced vision. He next saw plaintiff on September 27th when the vision had improved to 20/100, so he advised him he could return to work but not to work overhead. The doctor saw plaintiff next on October 9th when he made a positive diagnosis of "a hemorrhage or some bleeding back inside his eye." His vision on this date was 20/400, which condition was permanent.

In answer to a long hypothetical question limited to medical probability, the doctor testified that the incident related "could be a cause" of the loss of sight.

On cross examination, he admitted he did not know what caused the hemorrhage. He stated it could have been caused by a number of things and that plaintiff's alleged accident was only a possibility and he was unable to "say that based upon reasonable probability this incident caused his loss of vision," and further, that it was "kinda bad to be an expert witness and not know."

The only language in the Workmen's Compensation Act concerning causation of incapacity reads as follows:

"While the incapacity for work resulting from the injury is total . . ." Art. 8306, § 10, Vernon's Ann.Civ.St.

"While the incapacity for work resulting from the injury is partial . . ." Art. 8306, § 11, V.A.C.S.

Over the years, causation in many cases was phrased "producing cause" which, in the case at hand, was defined by the court as "a cause which, in a natural and continuous sequence, produces the incapacity, if any, in issue, and is such cause without which the incapacity, if any, would not have occurred."

Another definition may be seen in 2 Texas Pattern Jury Charges, § 26.03 at p. 129 (1970). It has also been defined as *"an efficient, exciting, or contributing cause which in a natural and continuous sequence produces incapacity."* (stronger emphasis supplied) Traders & General Ins. Co. v. Rooth, 268 S.W.2d 539, 542 (Tex. Civ.App., Waco, 1954, error ref. n. r. e.).

There is no difference between the terms "cause" and "producing cause." The proper inquiry under the section of the article is whether the injury "caused" the incapacity. Traders & General Ins. Co. v. Ray, 128 S.W.2d 80 (Tex.Civ.App., Eastland, 1939, error dism., judgm. cor.). In this case we believe the jury had sufficient evidence to warrant its finding of causation.

The appellant cites the case of Scott v. Liberty Mut. Ins. Co., 204 S.W.2d 16 (Tex. Civ.App., Austin, 1947, error ref. n. r. e.). There, plaintiff on March 27, 1944, said "'something blowed in my eye.'" On April 11, 1944, an eye specialist began treating him and discharged him on May 17, 1944. This doctor testified that when plaintiff first came to see him he had a common, non-malignant growth known as a pterygium and general irritation of the right eye. By May 17, 1944, the eye had

returned to normal except for the pterygium. In February, 1946, another doctor found a malignant tumor across the front of the eye and removed the eye. Both doctors testified at the trial that in their opinion the accident of March 27, 1944, had nothing to do with the cancerous condition found to exist approximately two years later. They both also testified that the scientific cause of cancer was unknown. The court commented that plaintiff had only proven his cancer might possibly be caused by the accident, which possibility being contradicted by the expert opinion of his own doctors, did not constitute any competent evidence of causal connection between the accident and the injury.

The appellant also urges its contention is supported by Insurance Company of North America v. Myers, 411 S.W.2d 710 (Tex.Sup.1966). There, Mrs. Myers on December 18, 1962, blacked out in her home, was sent to a neurosurgeon with complaints of tremors to the upper and lower extremities and severe headaches. On February 5, 1963, she was seen by the same doctor for pain in the neck and shoulders. Two days later, the doctor saw her in the hospital emergency room following a convulsion. On November 20th, another neurosurgeon removed a malignant tumor from her brain. Her condition steadily worsened until May 21, 1964, when she died of a glioblastoma of the left frontal and parietal lobes. Her husband and children contended that on July 1, 1963, Mrs. Myers momentarily grabbed a bundle of clothes weighing about 140 pounds causing a violent jerking in the neck and head which "'triggered or aggravated or accelerated the growth of the brain tumor.'" Three doctors testified this would not in reasonable medical probability excite or aggravate the malignant brain tumor causing her death. One physician who attended Mrs. Myers from approximately six weeks after removal of the tumor until her death testified in response to a hypothetical question that it was "reasonably probable that the injury she sustained *could have* aggravated the tumor, and become an exciting or concur-

ring cause, so that it was one of the causes, to whatever degree," of her death. *Myers Case,* supra (411 S.W.2d at p. 711, emphasis supplied).

Justice Steakley in speaking for our Supreme Court said:-

"It is our view that such occurrence, or not, is a question of science determinable only from the testimony of expert medical professionals. . . . Causal connection in such a fact situation must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture." (411 S.W.2d at p. 713).

And very importantly, he noted:-

*"We note as not controlling here those decisions in workmen's compensation cases in medical situations not involving the highly uncertain medical problem of the nature, origin and aggravation of cancer."* (411 S.W.2d at p. 714, emphasis supplied).

Appellant relies heavily on the recent case of Parker v. Employers Mutual Liability Ins. Co. of Wis., 440 S.W.2d 43 (Tex.Sup. 1969). There, plaintiff went to work in April, 1961, removing radioactive material from one spot to another. In September, 1963, he became a production operator, assembling and disassembling nuclear weapons. He wore protective clothing. In April, 1965, he noticed a swelling on the left side of his neck which when removed in June of 1965 proved to be cancerous and he subsequently died. Justice Hamilton, speaking for the court, wrote:

"The question now before us, then, is what evidence of causal connection between the employment and the plaintiff's injury there must be to justify the judge submitting the case to the jury. With cancer this question of causation is especially troublesome." (440 S.W.2d at p. 45).

"But this probability must, in equity and justice, be more than coincidence before there can be deemed sufficient proof for the plaintiff to go to the jury." (440 S.W.2d at p. 46).

"The expert testimony was to the effect that the etiology of cancer is really unknown. The doctors further testified that the cancer 'could have' been caused by radiation, but that there was no way to determine the cause." (440 S.W.2d at p. 47).

We have discussed these three cases at length because we feel it is necessary to our explanation of their distinction to the case at hand.

While there has been great advancement in the cure of cancer, at this point in time the relation of injury to cancer is mostly unknown. We think the courts are saying if medical science is unable to connect a causal relationship between injury and cancer and at most calling it a "possibility," how then can lay jurors?

■ We have a very different situation here. Plaintiff's blindness was caused by hemorrhage. As we view the evidence, Dr. Johnson is not testifying a hemorrhage can only possibly be caused by an injury as plaintiff had, but that he is unable to definitely say whether *this hemorrhage* was caused by this injury. No particular words from the medical experts are necessary to create a probability. *Myers Case,* supra (411 S.W.2d 710, 713). It can be based on the evidence as a whole. Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491, 493 (1907); Atkinson v. United States Fidelity & Guaranty Co., 235 S.W.2d 509, 514 (Tex.Civ.App., San Antonio, 1950, error ref. n. r. e.); and Parker v. Employers Mutual Liability Ins. Co. of Wis., supra (440 S.W.2d at p. 48).

It is true Dr. Johnson said that other things such as diabetes, high blood pressure or occlusion of the central retinal vein could cause eye hemorrhage, but there is no evidence here that plaintiff had any of these conditions.

From the very time of the injury here to the diagnosis of blindness by hemorrhage, there is a direct sequence of events which in our opinion justified the jury in finding that the injury was the cause of the loss of sight. It cannot be said that this case presents the conjecture found in the three cancer cases discussed above.

The judgment of the trial court is affirmed.

KEITH, J., not participating.